## UNITED STATES DISTRICT COURT
## DISTRICT OF MAINE

| | | |
|---|---|---|
| Carolyne Lord, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Docket No. |
| | ) | |
| Ocwen Loan Servicing, LLC, | ) | |
| | ) | |
| Ocwen Financial Corp., | ) | |
| | ) | |
| Deutsche Bank National Trust Company, | ) | |
| as Trustee for Ameriquest Mortgage | ) | |
| Securities Inc., Asset-Backed Pass- | ) | |
| Through Certificates, Series 2005-R3 | ) | |
| | ) | |
| Defendants. | ) | |

## <u>COMPLAINT</u>

## INTRODUCTION

This is an action for actual, compensatory, statutory, and punitive damages brought by Carolyne Lord (the "Plaintiff" or "Ms. Lord"), an individual consumer, against Ocwen Financial Corp. ("OFC"), their subsidiary Ocwen Loan Servicing, LLC ("Ocwen") and Deutsche Bank National Trust Company, as Trustee for Ameriquest Mortgage Securities Inc., Asset-Backed Pass-Through Certificates, Series 2005-R3 ("Deutsche Bank") (collectively, the "Defendants"), for violations of the Bankruptcy Code's Discharge Injunction pursuant to 11 U.S.C. § 524, the federal Fair Debt Collection Practices Act, 15 U.S.C. §§ 1692 *et seq.* and the Maine Fair Debt Collection Practices Act, 32 M.R.S.A. §§ 11001 *et seq.* (collectively, the "FDCPA"), the Maine Unfair Trade Practices Act  ("UTPA") 5 M.R.S.A. § 205-A et al; and the Real Estate Settlement Procedures Act ("RESPA") 12 U.S.C. §2506 et al.

## I.        JURISDICTION AND VENUE

1.      Jurisdiction in this Court is proper pursuant to 28 U.S.C. §§ 1331 and 1367.

2.      Venue is proper here pursuant to 28 U.S.C. § 1391, as the Plaintiff is a resident of York County, Maine, all relevant events giving rise to the Plaintiff's claims occurred in this District, and Defendants were doing business in Maine during all relevant times.

## II.      PARTIES

3.      Plaintiff Carolyne Lord is a natural person residing in York, Maine.

4.      Defendant Deutsche Bank National Trust Company, as Trustee for Ameriquest Mortgage Securities Inc., Asset-Backed Pass-Through Certificates, Series 2005-R3 ("Deutsche Bank") is a financial institution with a principal place of business in Los Angeles, California.

5.      Defendant OFC is a financial services holding company which services loans through subsidiaries, including Ocwen. OFC is a Florida corporation headquartered in West Palm Beach, Florida.

6.      Ocwen is a subsidiary of OFC and a limited liability company organized under the laws of Delaware, with a principal place of business in Florida.

7.      Defendant Ocwen acquired servicing of the Plaintiff's loan on or around October 2013, when said loan was in default.

8.      Defendant Ocwen has been the servicer of the Plaintiff's loan for, and under the authority, direction, and control of, Defendant Deutsche Bank since acquiring servicing of the loan.

9.      By employing Ocwen to service the Plaintiff's loan, Deutsche Bank was acting as the principal of Ocwen.

10.      As servicer of the Plaintiff's loan, Defendant Ocwen was and is acting as the agent of Defendant Deutsche Bank.

11.     Ocwen uses any instrumentality of interstate commerce and/or the mails in the collection of debts.

12.     The principal purpose of Ocwen's business is the collection of debts.

13.     Or, the principal purpose of Ocwen's business is the enforcement of security interests.

14.     Ocwen regularly collects or attempts to collect, directly or indirectly, debts owed or due or asserted to be owed or due another.

15.     Ocwen regularly collects or attempts to collect debts owed or due or asserted to be owed or due another that are in default at the time they obtain such debts.

16.     At all times relevant to this matter, Ocwen was a "debt collector" as that term is defined in the FDCPA, 15 U.S.C. § 1692a(6), 32 M.R.S.A. § 11002(6).


## III.     FACTS

**<u>Carolyne Lord's Bankruptcy</u>**

17. On February 12, 2005, Carolyne Lord entered into a Mortgage and Note (hereinafter "loan") with Ameriquest Mortgage Company on her property at 57 Maple Crest Rd., Parsonfield, ME 04047.

18. The property is a single family residential property and the loan was secured by a first lien on the property.

19. The loan was made by Ameriquest Mortgage Company who, at the time of origination, was a creditor who regularly extended consumer credit payable by agreement in more than four installments, was the entity to whom the debt arising from the consumer credit transaction was initially payable on the face of the Mortgage and Note, and made residential real estate aggregating more than $1,000,000 per year.

20. The loan is a "federally related mortgage loan" as that term is used in 12 U.S.C. § 2605 and defined in 12 U.S.C. § 2602(1) and 12 C.F.R. §1024.2.

21. The loan was sold to Deutsche Bank and placed in the Deutsche Bank Trust soon after origination.

22. On November 17, 2010, Ms. Lord filed a chapter 13 bankruptcy, case number 10-21910 in the U.S. Bankruptcy Court, District of Maine. A true and accurate copy of the Court Docket in the matter is attached hereto as Exhibit 1. By reference to the case number for her bankruptcy matter, the Plaintiff hereby incorporates her bankruptcy court filings in same. Specific docket entries are referred to as "Bankr. Doc.___ ."

23. Ms. Lord filed her initial chapter 13 plan on November 17, 2010, stating she would make ongoing payments to the mortgagee on her property at 57 Maple Crest Road, Parsonfield, ME. (Bankr. Doc.s 1, 3).

24. American Home Mortgage Servicing, Inc. (AHMS) was servicing the loan at 57 Maple Crest Road, Parsonfield, ME on behalf of Deutsche Bank at the time.

25. AHMS received notice of the bankruptcy filing. (Bankr. Doc. 6 ).

26. Deutsche Bank filed a Proof of Claim on the Parsonfield loan, listing AHMS as the name and address of where notices and payments should be sent. (Bankr. Doc. Claim No. 3).

27. The Bankruptcy Court ordered an interim confirmation of the plan on March 2, 2011, and for final confirmation to be addressed with a Motion to Allow and Disallow Claims. AHMS received notice of the Court Order on interim confirmation. (Bankr. Doc. 18).

28. Ms. Lord filed a Motion to Allow and Disallow Claims ("MADC") on June 20, 2011. AHMS received notice of the filing. (Bankr. Doc. 19, 20 ).

29. In the MADC, Ms. Lord sought to avoid a second mortgage on the Parsonfield property and to continue paying AHMS directly for the first mortgage.

30. The Court entered an Order Allowing and Disallowing Claims on September 29, 2011. (Bankr. Doc. 34, 35, 36).

31. Attorney Leonard F. Morley Jr. of Shapiro and Morley entered an appearance on behalf of Deutsche Bank in the bankruptcy on May 3, 2012. (Bankr. Doc. 37).

32. Deutsche Bank filed a Motion for Relief from Stay on May 31, 2012, to foreclose on the Parsonfield property. (Bankr. Doc. 38 ).

33. Ms. Lord consented to Deutsche Bank's Motion for Relief from Stay.

34. The Court granted Deutsche Bank's Motion for Relief from Stay on June 26, 2012. (Bankr. Doc. 39, 40 ).

35. Ms. Lord decided to surrender the Parsonfield property and filed a Motion to Amend the Order on the MADC on October 15, 2012, to specifically amend her plan to surrender the property in full and final satisfaction of Deutsche Banks's claim on the property. AHMS, on behalf of Deutsche Bank, received notice of the Motion. (Bankr. Doc. 44, 45).

36. The Court granted the Motion to Amend the Order Allowing and Disallowing Claims on January 19, 2013, which allowed Ms. Lord to surrender the Parsonfield property in full and final satisfaction of Deutsche Bank's claim. AHMS and Deutsche Bank received the Order. (Bankr. Doc. 53, 54 ).

37. Ms. Lord moved out of the property around May 2013. She continued to pay for the electricity to make sure the basement sump pumps still worked. She checked on the property every two weeks.

38. During one of these visits in the summer of 2013, Ms. Lord found the locks had been changed. She also found about $800 worth of her personal property stolen, which she reported to the police but was never recovered.

39. Upon information and belief, the property management company retained by Deutsche Bank to maintain the property was responsible for the lock change and stolen property.

40. On October 17, 2013, Ocwen Loan Servicing, LLC, on behalf of Deutsche Bank/AHMS filed a transfer of claim from Deutsche Bank/AHMS to Deutsche Bank/Ocwen Loan Servicing, LLC ("Ocwen"). (Bankr. Doc. 60, 61). Ocwen was the new servicer of the Parsonfield property loan on behalf of Deutsche Bank.

41. At the time Ocwen took on servicing of the loan, the loan was in default.

42. During this time, when Deutsche Bank did not initiated foreclosure proceedings, Ms. Lord contacted a real estate agent to do a short sale of the Parsonfield property.

43. Ms. Lord submitted a purchase and sale agreement dated December 12, 2013 to Ocwen in the amount of $80,000. A true and accurate copy of the agreement is attached hereto as Exhibit 2 and incorporated herein.

44. Ms. Lord moved to engage the real estate agent to conduct the short sale and the bankruptcy court granted the motion on February 13, 2014.

45. Ocwen, however, rejected the purchase and sale offer and the sale fell through.

46. Deutsche Bank filed a Complaint for Foreclosure on the Parsonfield property against Ms. Lord in the Maine State District Court, Springvale, on January 29, 2016. A true and accurate copy of the Complaint and Certificate of Notice are attached hereto as Exhibit 3 and incorporated herein.

47. Ms. Lord completed her chapter 13 bankruptcy and was granted her discharge on August 10, 2016. AHMS, Ocwen, and Deutsche Bank received notice of the discharge. (Bankr. Doc. 91).

48. Judgment entered on Deutsche Bank's foreclosure action against Ms. Lord on June 23, 2017. A true and accurate copy of the Judgment is attached hereto as Exhibit 4 and incorporated herein.

49. The foreclosure judgment stated that "[n]o deficiency is sought by the Plaintiff as, pursuant to an Order Discharging Debtor entered on August 10, 2016...the Defendants are not liable for any deficiency balance remaining due to the Plaintiff after the sale of the mortgaged real estate and application of the proceeds of sale." Ex. 4, p. 2.

50. The 90-day redemption period pursuant to 14 M.R.S.A. § 6322 ran on September 21, 2017.

**Communications from Ocwen to Carolyne Lord**

51. Ocwen delivered numerous "Delinquency Notice[s]" directly to Ms. Lord, including but not limited to notices delivered on or around October 17, 2016; November 15, 2016; December 16, 2016; January 19, 2017; February 17, 2017; March 21, 2017; April 21, 2017; May 24, 2017; June 20, 2017; August 18, 2017; and, September 19, 2017.These "Delinquency Notice[s]" state payment amounts due and their due dates and that Ms. Lord "must pay this amount…" True and accurate copies of the Ocwen Delinquency Notices are attached hereto as Exhibit 5 and incorporated herein.

52. On or around at least December 1, 2016, Ocwen delivered to Ms. Lord a copy of an insurance policy that Ocwen had placed on the Parsonfield property, stating that the

annual premium would be billed to her loan. A true and accurate copy of the December 1, 2016, notice is attached hereto as Exhibit 6 and incorporated herein.

53. On or around December 15, 2016, Ocwen delivered to Ms. Lord a notice of insurance options regarding her obligation to provide evidence of sufficient insurance coverage for the property. A true and accurate copy of the December 15, 2016, notice is attached hereto as Exhibit 7 and incorporated herein.

54. Ocwen delivered multiple letters to Ms. Lord regarding hazard insurance on the property, including but not limited to letters delivered on or around September 17, 2015; October 5, 2016; November 4, 2016; December 15, 2016; September 20, 2017; and, October 17, 2017. Most of these letters state that Ms. Lord would be charged over $1,000.00 for the annual premium on the insurance maintained by Ocwen. True and accurate copies of the hazard insurance letters are attached hereto as Exhibit 8 and incorporated herein.

55. On or around February 17, 2017, Ocwen delivered to Ms. Lord an "Annual Escrow Account Disclosure Statement," which provided the "first monthly mortgage payment…due on 04/01/2017, will be $898.71." A true and accurate copy of the February 17, 2017, escrow statement is attached hereto as Exhibit 9 and incorporated herein.

56. Ocwen alleged an ever-increasing "Amount Due" of over $190,000, a "Due Date" stating "Due Now," and attached a payment coupon including the alleged amount due in multiple monthly mortgage account statements delivered from Ocwen to Ms. Lord, including but not limited to statements dated December 19, 2016; January 17, 2017; February 17, 2017; March 17, 2017; April 17, 2017; May 17, 2017; June 19, 2017; August 17, 2017; September 18, 2017; and, November 17, 2017. The most recent

statement alleges a "Total Amount Due" of $206,380.47. True and accurate copies of the Ocwen monthly mortgage account statements are attached hereto as Exhibit 10 and incorporated herein.

57. Ocwen made over 75 calls to Ms. Lord regarding the mortgage debt from at least November 2016 to the present.

58. On or around mid-May, 2017, Ocwen called and spoke with Ms. Lord about the alleged debt. The representative stated he was her relationship manager and Ms. Lord gave him her bankruptcy information.

59. On or around July 11, 2017, Ocwen called and spoke with Ms. Lord. The representative explained he was a debt collector and this was an attempt to collect a debt. Ms. Lord explained about her bankruptcy and gave them information related to her case and attorneys.

60. On October 3, 2017, Ocwen called and spoke with Ms. Lord. The representative stated that there was $65,187.00 past due and $151,951.00 due total on her mortgage loan and wanted to know how she planned to address that. He then explained loss mitigation options to her.

61. Ocwen called and spoke with Ms. Lord on October 18, 2017. Ocwen asked if she was interested in financing options to cure the default on the loan and gave her a list of agencies and websites that could help her. The representative then asked if she wanted to make a payment on the account.

**Communications to Ocwen**

62. Ms. Lord, through counsel, delivered a letter dated June 30, 2017, to Ocwen at their address designated for Qualified Written Requests. The letter contained Ms. Lord's name,

address, the last four digits of her social security number, loan number, and account number. Ocwen received the letter on July 3, 2017. The letter was a Notice of Error pursuant to 12 C.F.R. § 1024.35. A true and accurate copy of the letter with attachments and return receipt is attached hereto as Exhibit 11 and incorporated herein.

63. Ocwen did not respond to the June 30, 2017 letter and continued to deliver letters and make calls to Ms. Lord attempting to collect on the discharged debt as outlined above.

64. In a written demand for relief dated October 5, 2017, a true and accurate copy of which, along with attachments and proof of deliver, is attached hereto as Exhibit 12 and incorporated herein, Ms. Lord, through counsel, notified Duetsche Bank of unfair and deceptive conduct pursuant to the Maine Unfair Trade Practices Act (UTPA) 5 M.R.S.A. § 213, outlining Ms. Lord's bankruptcy and Ocwen's attempts to collect on the discharged debt. Deutsche Bank did not respond to the October 5, 2017, letter.

65. Ms. Lord, through counsel, delivered a letter dated October 5, 2017, to Ocwen at their address designated for Qualified Written Requests. The letter was designated a Request for Information and Notice of Error pursuant to 12 C.F.R. §§ 1024.35 & .36 regarding Ocwen's attempts to collect on the discharged debt. The letter contained Ms. Lord's name, address, the last four digits of her social security number, bankruptcy case number and account number. Ocwen received the letter on October 10, 2017. A true and accurate copy of the letter, attachments, and return receipt is attached hereto as Exhibit 13 and incorporated herein.

66. The October 5, 2017 letter to Ocwen was also a demand letter pursuant the Maine Unfair Trade Practices Act ("UTPA"), 5 M.R.S.A. § 213, outlining Ms. Lord's bankruptcy and Ocwen's attempts to collect on the discharged debt. *See* Exhibit 13.

67. Ocwen acknowledged receipt of the October 5, 2017, letter in a letter dated October 17, 2017. A true and accurate copy of the letter is attached hereto as Exhibit 14 and incorporated herein.

68. Ocwen responded to the October 5, 2017, letter in a letter dated November 3, 2017. In the letter, Ocwen acknowledged Ms. Lord's chapter 13 bankruptcy but stated that they were notified the property was not surrendered and the loan is still outstanding and has not been paid in full. A true and accurate copy of the letter is attached hereto as Exhibit 15 and incorporated herein.

69. Ocwen did not respond to the demand made pursuant to UTPA.

70. When Ocwen failed to acknowledge, let alone correct their error, Ms. Lord paid certified mailing costs and attorney's fees to write and deliver yet another Qualified Written Request to Ocwen.

71. Ms. Lord also incurred substantial travel costs to meet with her attorneys twice due to Ocwen's failure to correct its errors. Ms. Lord presently resides in Roxbury, ME, resulting in round trips of close to 200 miles. This amounts to total travel costs of at least $205.55, calculated using the IRS standard business travel rate of 53.5 cents per mile for 2017.

72. Ms. Lord, through counsel, delivered a letter dated November 9, 2017, to Ocwen at their address designated for Qualified Written Requests. Ms. Lord also faxed the letter to the number designated in Ocwen's November 3, 2017, letter. The letter contained Ms. Lord's name, address, the last four digits of her social security number, bankruptcy case number, and account number. The letter was a Request for Information and Notice of Error pursuant to 12 C.F.R. §§ 1024.35 & .36. Ocwen received the letter on November 14,

2017. A true and accurate copy of the letter, attachments, and return receipt is attached hereto as Exhibit 16 and incorporate herein.

73. The November 9, 2017, letter again provided proof that the property had been surrendered in the chapter 13 bankruptcy and the debt discharged.

74. In a letter dated November 14, 2017, Ocwen acknowledged receipt of the November 9, 2017, letter from Ms. Lord. A true and accurate copy of the letter is attached hereto as Exhibit 17 and incorporated herein.

75. In a letter dated December 8, 2017, Ocwen admitted that Ms. Lord had surrendered the property in her bankruptcy and that Ms. Lord is not personally liable for the mortgage loan debt. Ocwen, however, continues to misrepresent that Ocwen may foreclose on the property if the required payments are not received, after they had already completed a foreclosure. A true and accurate copy of the letter is attached hereto as Exhibit 18 and incorporated herein.

76. After Ms. Lord's discharge, Ocwen reported a balance due and late payments on the loan to credit reporting agencies.

77. As of November 21, 2017, Ocwen was reporting to Experian a "recent balance" of $151,952 due on the loan and a "past due amount" of $73,372.

78. Ocwen has continued to communicate with Ms. Lord about the property and demand money from Ms. Lord that she does not owe due to the bankruptcy discharge and foreclosure judgment. *See* Ex.s 5, 6, 8, 9 and 10.

79. Upon information and belief, and based on Ocwen's conduct to date, they will continue to call Ms. Lord and send her notices attempting to collect, and related to, the mortgage debt.

80. Upon information and belief, Ocwen has inadequate policies and procedures in place to process accounts that are transferred to them and process debts discharged through bankruptcy including mortgage loans surrendered in a chapter 13 bankruptcy.

81. Upon information and belief, Ocwen does not have proper policies and procedures in place to properly process Maine foreclosure actions.

82. Upon information and belief, Ocwen has engaged in a pattern and practice of failure to integrate accounts transferred to them to accurately reflect the current status and balance of the borrower's loan and for attempting to collect on amounts not due under mortgage loans from bankruptcy debtors as they did with Ms. Lord.

83. Upon information and belief, Ocwen has engaged in a pattern and practice of attempting to collect mortgage debts from debtors that they do not owe. *See e.g., In re Alley*, 09-21500, 2014 WL 2987656, at *1 (Bankr. D. Me. July 1, 2014); *Yarney v. Ocwen Loan Servicing, LLC*, 929 F. Supp. 2d 569, 577-78 (W.D. Va. 2013); *Oliver v. Ocwen Loan Services, LLC*, C12-5374 BHS, 2013 WL 210619, at *4-5 (W.D. Wash. Jan. 18, 2013); *Saccameno v. Ocwen Loan Servicing, LLC*, 15 C 1164, 2015 WL 7293530, at *1-2 (N.D. Ill. Nov. 19, 2015); *Barton v. Ocwen Loan Servicing LLC*, CIV. 12-162 MJD, 2013 WL 5781324, at *6 (D. Minn. Oct. 25, 2013). *See also* the well-plead allegations in: *Ackley v. Ocwen et al,* Civ. No. 2:16-cv-15-JDL (D. Me. 2016); *Ackley v. Ocwen et al*, Civ. No. 2:15-cv-43-JDL (D. Me. 2015); *Fogg v. Ocwen et al,* Civ. No. 1:16-cv-226-GZS (D. ME 2016); *Fogg v. Ocwen et al*, Civ. No. 2:14-cv-454-GZS (D. Me. 2015); *In re Alley*, Civ. No. 13-02070, (Bankr. D. Me. 2014); *Carson v. Ocwen et al,* Civ. No. 2:150-cv-514-DBH (D. Me 2015).

84. On February 26, 2014, the Consumer Financial Protection Bureau (CFPB), together with attorneys general and state banking regulators in 49 states and the District of Columbia, obtained a Consent Judgment against OFC and its subsidiary Ocwen in the U.S. District Court for the District of Columbia, No. 13-cv-2025 (RMC). The consent order addresses OFC and Ocwen's misconduct in mortgage servicing and includes a provision that Ocwen is to reconcile a debtor's account upon an order granting a bankruptcy discharge to a debtor. Consent Order, Ex. A, ¶11(c). A copy of the Consent Judgment can be found at: https://nationalocwensettlement.com/Portals/0/Documents/ConsentJudgement.pdf.

85. On December, 2014, Ocwen entered into a consent order with the New York State Department of Financial Services in part for Ocwen's "failing to demonstrate implementation of policies and procedures to verify borrower information on newly boarded accounts to accurately reflect the status and current balance of the borrower's account" and "inadequate and ineffective information technology systems and personnel." A true and accurate copy of the Order is attached hereto as Exhibit 19 and incorporated herein by reference.

86. On April 20, 2017, the Commissioner of Banks of Massachusetts entered an Order to Cease and Desist, No. 2017-001, against Ocwen in part for problems with Ocwen's system of record, REALServicing, including "insufficient integration following acquisitions of other servicers."

87. At least 19 other states have taken regulatory action against Ocwen for issues with its REALServicing platform, which is used to process and apply borrower payments, communicate payment information to borrowers, and maintain loan balance information.

88. Upon information and belief, Ocwen was using its REALServicing platform in servicing

Ms. Lord's loan.

89. On April 20, 2017, the Maine Bureau of Consumer Credit Protection, a part of a Multi-State Mortgage Committee, entered a Cease and Desist Order against OFC and Ocwen, Docket Number 2017-0103, causing Ocwen to immediately cease acquiring new mortgage servicing rights, and acquiring or originating new residential mortgages serviced by Ocwen due, in part, to their inability to accurately reconcile many of the consumer escrow accounts in its portfolio and routinely sending consumers "inaccurate, confusing and/or misleading escrow statements." The Order can be found at the Bureau's website: http://www.maine.gov/tools/whatsnew/index.php?topic=CCR-LegalDocs&id=742009&v=Default.

90. Maine has received 55 complaints for Ocwen since late 2012, dealing with escrow, accounting, or other loan servicing issues. *Id.*

91. Ocwen's continued attempts to collect on the discharged debt from Ms. Lord caused her severe emotional distress. The first phone call she received from Ocwen was "heart stopping" when they said she still owed them over $190,000 even after the bankruptcy. She was afraid that somehow there had been a mistake, maybe a paper not filed or signed, and she now owed Ocwen this astronomical amount of money. Ocwen called her relentlessly after the bankruptcy discharge and even after several letters from her attorneys. She gave Ocwen her bankruptcy information numerous times but they still keep telling her she owed an outrageous amount of money. Every phone call and notice felt like starting over with them. She became increasingly irritable, frustrated, and angry and feared they would not stop and she would be responsible for the huge amount of money, which she knew she could never pay.

92. Ms. Lord also felt ashamed and embarrassed. She had filed bankruptcy and ultimately decided to surrender the property because she could not afford it. That process caused her a lot of guilt. She thought surrendering the property in her bankruptcy would give her a fresh start. After the discharge, she felt hope.  Having Ocwen constantly remind her of the property and debt owed, however, made her remember the shame and guilt she felt in not being able to pay her mortgage. When the Ocwen notices and calls would not cease, Ms. Lord became more withdrawn and stopped doing things that used to give her pleasure such as making crafts and playing music.

93. Ms. Lord also suffers from fibromyalgia and the stress of Ocwen's calls and notices has caused her illness to become worse, causing her a lot of physical pain. The effort and energy she has put into dealing with this problem has caused her sleeplessness, muscle pain, and flare-ups that landed her in bed for days.  It has also caused her to be depressed and anxious.  The stress of the issues has also led to tension and fighting between her and her partner of 20 years.

## IV.    CLAIMS

### COUNT ONE: Violation of the Bankruptcy Discharge Injunction, 11 U.S.C. § 524
### (Ocwen/ Deutsche Bank)

94. The Plaintiff repeats and realleges and incorporates by reference the paragraphs above as if fully set out herein.

95. Ocwen had notice of Ms. Lord's bankruptcy, including the discharge, and participated in Ms. Lord's bankruptcy. *See* Doc. No.10-21910.

96. Ocwen violated the Bankruptcy Discharge Injunction, 11 USC § 524, by, including but not limited to, having notice of the bankruptcy filing and willfully 1) attempting to collect

on the discharged loan; 2) misrepresenting amounts due related to the discharged loan; 3) misrepresenting the status of the discharged loan; and 4) reporting inaccurately to the credit reporting bureaus.

97.  Ocwen's conduct was unfair, coercive, harassing, willful, and knowing.

98. Ms. Lord felt harassed and coerced to the point that she believed Ocwen would not stop until she paid them everything they claimed she owed, an impossible task given the amounts they claimed due.

99. As a result of Ocwen's conduct, including its actions and inactions, Ms. Lord suffered actual damages, including but without limitation: attorneys' fees and mailing costs, utter frustration and desperation, and other emotional and mental distress as outlined above.

100.    Further, as detailed above, Ocwen has engaged in a pattern and practice of trying to collect from debtors on debts listed in bankruptcy.

101.    Such conduct is outrageous and egregious.

102.    Ocwen's actions demonstrate its knowing, willful violation of 11 U.S.C. § 524.

103.    Deutsche Bank had notice of the bankruptcy and participated in the bankruptcy. *See* Bankr. Doc.37-40.

104.    Deutsche Bank is individually liable for violation of the bankruptcy discharge injunction by hiring and maintaining Ocwen as servicer for Ms. Lord's loan when it knew or should have known Ocwen engaged in a pattern and practice of violating 11 U.S.C. §524.

105.    Deutsche Bank was reckless in employing Ocwen to continue servicing Ms. Lord's loan.

106.    As the principal of Ocwen, Deutsche Bank is also jointly and severally liable for

Ocwen's conduct.

107.     Ms. Lord is entitled to receive from the Defendants actual and compensatory

damages, including costs and attorneys' fees, and punitive damages in this matter

pursuant to 11 U.S.C. § 524, and further relief as may be just and proper.

**<u>COUNTS TWO and THREE</u>: Violation of the Fair Debt Collection Practices Act, 15
U.S.C. § 1692 *Et Seq.*, and the Maine Fair Debt Collection Practices Act, 32 M.R.S.A. §
11001 *Et Seq.*
(Ocwen)**

108.     The Plaintiff repeats and realleges and incorporates by reference the paragraphs

above as if fully set out herein.

109.     Within one year prior to the filing of this suit, and ongoing for more than one year

prior, by example only and without limitation, Ocwen violated the Fair Debt Collection

Practices Act, 15 U.S.C. § 1692 *et seq.*, and the Maine Fair Debt Collection Practices Act

32 M.R.S.A. § 11001 *et seq.* (collectively the "FDCPA"), as outlined above, specifically

by:

a.   Falsely representing the character, amount, and legal status of the loan debt through letters

dated at least September 19, 2016 to the present, phone calls, and reports to the credit reporting

agencies (15 U.S.C. § 1692e(2); 32 M.R.S.A. § 11013(2)(B)) Ex.s 5-10;

b.   The use of false representations and deceptive means to collect on the loan debt through

letters, statements, calls, and inaccurate credit reporting (15 U.S.C. § 1692e(10); 32 M.R.S.A. §

11013(2)) *Id.*;

c.   Engaging in conduct, the natural consequence of which was to harass, oppress or abuse Ms.

Lord in connection with the collection of the mortgage debt by delivering notices and making

phone calls seeking payment of monies not owed, misrepresenting the status of the debt, and

reporting inaccurate amounts owed to the credit reporting agencies. (15 U.S.C. § 1692d; 32 M.R.S.A. § 11013(1)) *Id*;

d.  Using unfair or unconscionable means to collect or attempt to collect on the mortgage debt through letters, statements, and calls misrepresenting the status of the debt, and inaccurate credit reporting. (15 U.S.C. § 1692f; 32 M.R.S.A. § 11013(3)) *Id*.

110.    As a result of the conduct, actions and inactions of Ocwen, Ms. Lord suffered actual damages including, without limitation, legal fees and costs, costs associated with trying to address and stop the conduct, harassment, coercion, fear and anxiety, and other emotional and mental distress as detailed above.

111.    Ms. Lord is entitled to recover actual damages, including emotional distress damages, statutory damages, costs and attorney's fees from Ocwen, and such further relief as may be just and proper.

## COUNT FIVE: Violation of the Unfair Trade Practices Act, 5 M.R.S.A. § 205-A *Et Seq.* (Ocwen/ Deutsche Bank)

112.    The Plaintiff repeats and realleges and incorporates by reference the paragraphs above as if fully set out herein.

113.    The Defendants violated the Maine Unfair Trade Practices Act by engaging in unfair and deceptive conduct, including but not limited to: (a) attempting to collect on debt that had been discharged in the bankruptcy; (b) misrepresenting amounts now due; (c) misrepresenting the status of the debt; (d) attempting to collect on hazard insurance premiums when the property had been surrendered and the debt discharged in the bankruptcy; (e) attempting to collect money from Ms. Lord on the debt after foreclosure judgment entered and after the redemption period had run; (f) calling Ms. Lord repeatedly

in an attempt to collect the debt; (g) failure to correct the issue after complaints by Ms. Lord and her counsel; (g) soliciting Ms. Lord's for a new modification to pay on the discharged debt; and (h) misreporting inaccurate amounts due to the credit reporting agencies.

114.     Such conduct was unfair and deceptive as it would mislead the average consumer, and did mislead Ms. Lord, regarding the status of her loan and amounts owed.

115.     Such conduct misled Ms. Lord to believe she might somehow owe this money and that the only way to get Ocwen to stop would be to pay the outrageous amounts alleged owed, which she could not do.

116.     Ms. Lord sent demand letters to Ocwen and Deutsche Bank per 5 M.R.S.A. § 213 on October 5, 2017. Ex. 12, 13.  Neither Ocwen nor Deutsche Bank provided an offer to settle.

117.     The Plaintiff is entitled to actual damages, including emotional damages, attorneys' fees and costs, and such other relief the Court does deem just, equitable, and proper.

## COUNT SIX: Violation of the Real Estate Settlement Procedures Act 12 U.S.C. § 2605 et seq. and 12 C.F.R. §§ 1024.35 & .36
### (Ocwen)

118.     The Plaintiff repeats and realleges and incorporates by reference the paragraphs above as if fully set out herein.

119.     Ms. Lord, through counsel, delivered Qualified Written Requests (QWRs) which included a Notice of Error (NOE) and Requests for Information (RFI) to Ocwen on October 5, 2017, and November 9, 2017, to Ocwen's designated address or fax number. The name of the borrower, the account number, and a statement of the reasons why Ms.

Lord believed the account was in error, including supporting documents, were included in the QWRs. Ex.s 13, 16.

120.     Ocwen failed to conduct a reasonable investigation into the errors alleged in the QWR and correct all such errors.

121.     In its November 3, 2017, response (Exhibit 15), Ocwen incorrectly stated that the property was not surrendered and the "above referenced loan is still outstanding and has not been paid in full."

122.     This response caused Ms. Lord increased anxiety and distress and she believed that somehow she might actually owe the money and that Ocwen really would not stop trying to collect this money from her because they still believed she owed it.

123.     In their letter dated December 8, 2017 (Exhibit 18), Ocwen finally admitted that, because of the bankruptcy discharge, Ms. Lord was not personally liable on the debt. Ocwen continued to state, however, that Ocwen may foreclose its security interest in the property and that the foreclosure hold will be removed once the concern is addressed on the loan, even though a foreclosure had already been completed.

124.     These continued misrepresentations and inaccuracies caused Ms. Lord great alarm and concern, wondering if there had been a mistake with her bankruptcy and she actually owed the money or whether Ocwen ever would figure out the correct status of the loan.

125.     Ocwen further failed to provide the name and telephone number of an individual employed by, or the office or department of, the servicer who can provide assistance to the borrower.

126.      Upon information and belief, Ocwen continued to provide information regarding alleged overdue payments by Ms. Lord's to the credit reporting agencies during the 60-day period after receipt of the QWRs.

127.      Ocwen's multiple violations of RESPA evidence a pattern and practice of violation of RESPA.

128.      Ocwen also has engaged in a pattern and practice of failing to comply with RESPA in other cases locally and nationwide as noted above.

129.      Ocwen does not have proper policies and procedures in place to properly evaluate and respond to borrowers' QWRs and comply with the requirements of RESPA.

130.      Had Ocwen investigated the issues and corrected the account after the first QWR, Ms. Lord would not have had to incur mailing costs and fees to send a second QWR.  Ms. Lord also would not have suffered much of the emotional distress described above related to Ocwen's continued insistence that she owed over $190,000 on the loan.  .

131.      Ms. Lord is entitled to actual and statutory damages, attorneys' fees and costs, as well as any other relief the Court deems appropriate.


### **Demand for Jury Trial**

Please take notice that the Plaintiff demands a trial by jury in this action.


Dated at Biddeford, Maine, this 18th day of January, 2018.

/s/*Andrea Bopp Stark*
Andrea Bopp Stark, Esquire
Christopher J. Keach Esquire
Molleur Law Office
419 Alfred Street
Biddeford, ME 04005-3747
Office:  207-283-3777
Fax:  207-283-4558

Email:  andrea@molleurlaw.com